UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Case No. 21-CR-31 (JMC) |
| : | |
| KIM MARIE CONNOLLY, : | |
| : | |
| Defendant. : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Kim Marie Connolly to 36 months' probation, with 60 days' home detention as a condition of probation. The government also requests that this Court impose 60 hours of community service, a $10 special assessment, and, consistent with the plea agreement in this case, $500 in restitution.

**I.      Introduction**

Kim Marie Connolly, age 52, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

1

Connolly pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating, or picketing in a Capitol building). The government's recommendation is supported by Connolly's extensive travel through the Capitol and photos she sent to friends after the fact, bragging that "we're in."

The Court must also consider that Connolly's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for her actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Connolly's crime support a sentence of 36 months' probation, 60 days' home detention as a condition of probation, 60 hours of community service, and $500 in restitution in this case. Such a sentence reflects the seriousness of Connolly's actions, which disrupted the work of the police and helped to end our country's 150-year tradition of peaceful transfers of power. Yet the punishment is sufficiently flexible that Connolly can continue with her family responsibilities.

## II.   Factual and Procedural Background

### A.   The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* Complaint at 2-3, *United States v. Connolly*, 1:23-CR-31 (DDC Jan. 18, 2023) (Cobb, J.), ECF No. 1.

### B.   Connolly's Role in the January 6, 2021 Attack on the Capitol

At approximately 2:34 p.m., Connolly entered the Capitol through the Upper West Terrace doors. ECF No. 1 at 4. She did so less than two minutes after rioters first broke the doors open,

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

and as an alarm blared through the hallway—a sign that people were not to enter the building. Exhibit 1 (video showing the defendant entering the building through the Upper West Terrace doorway as alarms blared); Exhibit 2 (closed-circuit video showing the same). Connolly wore a long, light purple scarf, a long black coat, a black backpack, a red hat, and glasses. *Id.*



*Image 1: Connolly entering the Capitol*

Connolly then walked through the hallway and traveled up the stairs toward the Rotunda, holding a cell phone to her ear.



*Image 2: Connolly traveling down the hallway*

At approximately 2:35 p.m., Connolly entered the Capitol Rotunda. *Id.* at 6. Connolly turned sharply north, stopped at the Rotunda entrance door, and turned around and took photographs of the Rotunda ceiling at approximately 2:36 p.m. *Id.*



*Image 3: Connolly entering the Rotunda*

At approximately 2:39 p.m., Connolly walked down a set of stairs to the Capitol Crypt, continuing straight. *Id.* at 9.



*Image 4: Connolly descending stairs*

At approximately 2:41 p.m., at the east end of the Crypt lobby, Connolly stopped to talk to an unknown male. *Id.* at 10.



*Image 5: Connolly talking with a man*

At approximately 2:42 p.m., Connolly then walked across to the Crypt itself. *Id.* at 12.



*Image 6: Connolly walking through the Crypt*

At approximately 2:42 p.m., Connolly neared the staircase by the Memorial Door. Connolly appeared to be ushered by police out of the Crypt at that time. *Id.* at 13.



*Image 7: Connolly near the Memorial Door staircase*

At approximately 2:42 p.m., Connolly walked down the Hall of Columns *Id.* at 14. Connolly left the Capitol building at approximately 2:44 p.m., having spent approximately nine minutes inside the Capitol. *Id.*



*Image 8: Connolly walking down the Hall of Columns*

9

Afterwards, Connolly sent several pictures from the day to her friends, bragging in one caption, "we're in."

### C. The Charges and Plea Agreement

On January 19, 2023, the United States charged Connolly by a four-count information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On September 12, 2023, pursuant to a plea agreement, Connolly pleaded guilty to Count Four of the Information, which charged her with violating 40 U.S.C. § 5104(e)(2)(G). By the terms of the plea agreement, Connolly agreed to pay $500 in restitution to the Architect of the Capitol.

## III. Statutory Penalties

Connolly now faces a sentencing for violating 40 U.S.C. § 5104(e)(2)(G). As noted in the plea agreement, Connolly faces up to six months of imprisonment and a fine of up to $5,000. Connolly must also pay restitution under the terms of her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV. Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 36 months' probation, 60 days' home detention as a condition of probation, 60 hours of community service, and $500 in restitution.

### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds

10

of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Connolly's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Connolly, the absence of violent or destructive acts is not a mitigating factor. Had Connolly engaged in such conduct, she would have faced additional criminal charges.

One of the most important factors in Connolly's case is her extensive travel through the Capitol. Unlike some nonviolent rioters who peeked into the building and quickly left or who confined themselves to a small part of the Capitol, Connolly worked her way through much of the building, from the Upper West Terrace doors to the Rotunda on the second floor, to the Crypt lobby and the Crypt itself on the first floor, over to the Memorial Door, and out through the Hall of Columns. Highly mobile rioters like Connolly made it harder for police to control and ultimately contain the mass of people who broke into the building. So, while nonviolent, Connolly's actions were still harmful to police officers and added to the chaos that delayed the Electoral College certification vote for several hours.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of home detention in this matter.

### B. Connolly's History and Characteristics

Connolly has no criminal history and cares for an ailing family member. PSR ¶¶ 21, 27.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration,

as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233 (ABJ), Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.").

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-cr-41 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider. The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to

occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again.") (statement of Judge Walton). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188 (RDM), Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Connolly did not show any immediate remorse for her actions on January 6. Rather, she bragged to friends that "we're in," and shared pictures of herself and the Capitol. By accepting a plea, Connolly has acknowledged that her actions broke the law. But it is impossible to know whether the forces within Connolly that drove her to storm the Capitol have abated. With another election approaching, it is important that Connolly understand the gravity of her crimes—how they endangered elected officials, staffers, and police, and how they threatened democracy itself—in order to discourage her from future violence.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[2] This

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Court must sentence Connolly based on her own conduct and relevant characteristics, but should give substantial weight to the context of her unlawful conduct: her participation in the January 6 riot.

Connolly has pleaded guilty to Count Four of the Information, charging her with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Connolly's actions are in many ways similar to—though in other ways different from—the cases below.

In *United Sates v. Genco*, 1:22-cr-62 (Cobb, J.), the defendant breached the restricted area of the Capitol grounds. She did so with clear knowledge that she was not supposed to enter the area. After the violent breach of barriers on the Pennsylvania Avenue walkway, Genco proceeded to the Capitol's West Front. She remained in that area for over an hour, despite incidents of violence from the mob and the efforts of police to disperse the crowd with warnings, commands, chemical irritants and non-lethal projectiles. The Court sentenced Genco to 12 months' probation, 60 hours of community service, and a $500 fine. Connolly's behavior was more severe than

Genco's in that Connolly actually entered the Capitol. She thus deserves a more serious sentence than what Genco received.

In *United States v. Gable*, 1:22-cr-189 (Cobb, J.), the defendant breached the Capitol through the Senate Wing Door, then spent more than 30 minutes in the Capitol before joining rioters threatening the Speaker of the House of Representatives by repeatedly chanting "Nancy." Gable then lied to the FBI. He was sentenced to 24 months' probation, 45 days of home confinement, a $1,000 fine, 50 hours of community service, and $25 in restitution. Connolly's behavior was less severe than Gable's: she did not lie to the FBI, and did not threaten an elected official. She did, however, brag about her actions, sending pictures to friends and saying, "we're in." Connolly's actions warrant a sentence similar to Gable's.

In *United States v. Rutledge*, 1:21-cr-643 (Kollar-Kotelly, J.), the defendant entered the Capitol through the Senate Wing at 3:12 p.m., where it was clear that rioters had forced entry. There she had a clear view of rioters clashing with police. She left the building 3:16 p.m., four minutes after she entered. Rutledge expressed no remorse for what she did. For her actions, she was sentenced to three months' home detention. Connolly's behavior in the Capitol was more serious than Rutledge's: she was in the building for ten minutes, and traveled extensively, contributing to a disruption of police officers' work. Connolly thus warrants a sentence comparable to Rutledge's.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize

and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

### F. Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[3] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Connolly must pay $500 in restitution, which reflects in part

---

[3] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

16

the role Connolly played in the riot on January 6.[4] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. *Id.* Connolly's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities.

---

[4] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## V. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Connolly to 36 months' probation, 60 days' home detention as a condition of probation, 60 hours of community service, a $10 special assessment, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Connolly liberty as a consequence of her behavior, while recognizing her acceptance of responsibility for her crime and her caretaking obligations for her family.

Respectfully submitted,

DATED: December 5, 2023

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: /s/ Brendan Ballou
Brendan Ballou
DC Bar No. 241592
Special Counsel
United States Attorney's Office
601 D Street NW
Washington, DC 20001
(202) 431-8493
brendan.ballou-kelley@usdoj.gov